# EXHIBIT A

*1*

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK COUNTY, SS.                                   SUPERIOR COURT

                                                     DEPARTMENT OF THE

_____X                    TRIAL COURT


ROBERT LUX, MD and MARY ELIZABETH                    CIVIL ACTION NO. 21-2499 C
LUX


            Plaintiffs,


v.


LIVANOVA DEUTSCHLAND, GMBH
f/k/a Sorin Group Deutschland, GMBH
LIVANOVA  HOLDING USA, INC f/k/a Sorin
Group USA, Inc
THE GENERAL HOSPITAL
CORPORATION d/b/a MASSACHUSETTS
GENERAL HOSPITAL
SERGUEI MELNITCHOUK
MD, MPH

CHIEF PERFUSIONIST AT MASSACHUSETTS
GENERAL HOSPITAL


            Defendants

_____X

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
2021 NOV -2  A  9: 28
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

1

## CIVIL ACTION COMPLAINT –
## MEDICAL MALPRACTICE and PRODUCT LIABILITY

Plaintiffs, Robert Lux, MD, and Mary Elizabeth Lux, bring this medical malpractice and products liability action against Defendants named herein. In support of their Complaint, Plaintiffs state as follows:

### INTRODUCTION

1.     Plaintiff, Robert Lux, MD, contracted a nontuberculous Mycobacterium chimaera ("*M. chimaera*") infection after undergoing a noninvasive mitral valve repair with a Sorin 3T heater-cooler unit ("3T HCU") at Massachusetts General Hospital on January 25, 2017.

2.     The 3T HCU was contaminated with *M. chimaera* during the manufacturing process and the 3T HCU's design allowed difficult-to-remove biofilm to form and grow within the device. The design also allowed the machine to aerosolize bacteria into the operating room causing Plaintiff Robert Lux's infection.

3.     As set forth herein, 3T HCUs are the only known cause of a global outbreak of disseminated *M. chimaera* infections in cardiac surgery patients.

4.     As set forth herein, disseminated *M. chimaera* infections are chronic, largely incurable and have a mortality rate in excess of 50%.

5.     Despite the dangerous propensities of the 3T HCUs, that were known or should have been known to Massachusetts General Hospital, Serguei Melnitchouk, MD, MPH, and the Chief Perfusionist at Massachusetts General Hospital prior to Plaintiff Robert Lux's January 25, 2017 surgery, these Defendants: (1) failed to remove the 3T HCUs from the cardiac operating room; (2) failed to divert the contaminated aerosols exhausted from the 3T HCUs out of the operating room; (3) failed to

2

properly maintain their 3T HCUs; and (4) permitted a contaminated 3T HCU to be used during Plaintiff

Robert Lux's noninvasive mitral valve repair exposing him to risk of infection from their 3T HCU.

6.       Plaintiff Robert Lux has suffered enormous pain and suffering as a result of his *M. chimaera* infection, and continues to suffer severe and permanent damages and disfigurement, as a direct and proximate result of Defendants' wrongful conduct complained of herein.

## PARTIES

7.       Plaintiff Robert Lux, MD, ("Robert Lux") is a citizen and resident of the State of New Hampshire, residing therein at 7 Allen Road, Bow, NH 03304.

8.       Plaintiff Robert Lux was born on February 27, 1946.

9.       Plaintiff Mary Elizabeth Lux is a citizen and resident of the State of New Hampshire, residing therein at 7 Allen Road, Bow, NH 03304.

10.     Plaintiff Mary Elizabeth Lux was born on March 12, 1941.

11.     Defendant LivaNova Deutschland, GmbH f/k/a Sorin Group Deutschland GmbH (hereinafter "LivaNova Deutschland") is a foreign corporation headquartered in Munich, Germany, with a principal place of business located at Lindberghstrasse 25, Munich, 80939, Germany.

12.     Defendant LivaNova Holding, USA, Inc. f/k/a Sorin Group USA, Inc., (hereinafter "LivaNova USA") is a Delaware corporation with a principal place of business located at 100 Cybertronics Blvd, Ste 600, Houston, Texas, 77058-2017, U.S.A.   LivaNova USA is a registered corporation with the California Secretary of State.   LivaNova USA's registered agent in California is CT Corporation System, doing business at 818 W. 7th Street, Suite 930, Los Angeles, California 90017.

13.     Defendant The General Hospital Corporation d/b/a Massachusetts General Hospital (hereinafter "MGH"), is a non-profit hospital organized and existing under the laws of the

3

Commonwealth of Massachusetts, with a principal place of business at 55 Fruit Street, Boston Massachusetts, 02114. Plaintiffs are asserting a claim against this Defendant for professional negligence and the professional negligence of its agents, employees, and/or servants. Notice pursuant to M.G.L. ch. 231 § 60L was provided on December 17, 2020.

14.     Defendant Serguei Melnitchouk, MD, MPH, (hereinafter "Dr. Melnitchouk") at all times pertinent hereto, was a duly licensed and practicing cardiac surgeon in the Commonwealth of Massachusetts, with a business address of 55 Fruit Street, Boston Massachusetts, 02114. Plaintiffs are asserting a claim against this Defendant for professional negligence and the professional negligence of its agents, employees, and/or servants. Notice pursuant to M.G.L. ch. 231 § 60L was provided on December 17, 2020.

15.     Defendant Chief Perfusionist at Massachusetts General Hospital (hereinafter "Chief Perfusionist") is a fictitious name for the Chief Perfusionist(s) at Massachusetts General Hospital from 2014 through January 25, 2017, with a business address of 55 Fruit Street, Boston Massachusetts, 02114, and whose identity is presently known to Hospital Defendants and unknown to Plaintiffs.

16.     At all times material hereto, Defendants, LivaNova Deutschland and/or LivaNova USA (hereinafter collectively referred to as "Manufacturer Defendants") were engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly, numerous medical devices, including the 3T HCU, throughout the United States, including in the Commonwealth of Massachusetts. Upon information and belief, Manufacturer Defendants collectively designed, tested, assembled, manufactured, marketed, distributed and/or sold the 3T HCU, which was used during Plaintiff Robert Lux's cardiac surgery on January 25, 2017.

17.     As set forth below in the operative facts, at all relevant times hereto, by January 2014, the Manufacturer Defendants knew, or should have known that: (1) they had contaminated 3T HCUs during the manufacturing process and shipped those units to hospitals preloaded with *M. chimaera* biofilm; (2) the cleaning instructions for the 3T HCUs had never been verified as effective at removing or abating *M. chimaera* and could not eliminate the bacterium from the 3T HCU water circuit; (3) design defects in their 3T HCU promoted the growth of irradicable *M. chimaera* biofilm; and (4) design defects in the 3T HCU allowed aerosols contaminated with *M. chimaera* to escape the units and disperse throughout sterile operating rooms during use, infecting patients like Plaintiff Robert Lux with an incurable, debilitating and highly lethal bacterium.

18.     At all relevant times alternative heater-cooler designs were available that would have reduced the risk of biofilm formation and eliminated the risk of contaminated aerosols escaping the heater-cooler unit and infecting patients during surgery.

19.     As set forth below in the operative facts, at all relevant times hereto, Defendant MGH owned and operated at least one 3T HCU, which was manufactured, sold, and distributed by the Manufacturer Defendants.

20.     As set forth below in the operative facts, at all relevant times hereto, Dr. Melnitchouk was a cardiac surgeon at MGH who requested and/or permitted a 3T HCU to be used as the heater-cooler device in cardiac surgeries where he was the primary surgeon, including in Plaintiff Robert Lux's January 25, 2017 mitral valve repair with annuloplasty ring surgery.

21.     At all times relevant hereto, Chief Perfusionist was responsible for the cleaning, repair, and maintenance of the 3T HCUs at MGH and for reading, understanding, and acting upon information received from the Manufacturer Defendants or other outlets pertaining to the safe cleaning, repair,

maintenance, and use of the 3T HCUs in cardiac surgery at MGH.

22.     Hereinafter, Defendants MGH, Dr. Melnitchouk, and Chief Perfusionist shall be collectively referred to as the "Hospital Defendants."

23.     On December 17, 2020, Plaintiffs' counsel sent a Notice of Intent to Sue letter to Hospital Defendants, pursuant to M.G.L. ch. 231 § 60L.

## OPERATIVE FACTS

24.     The 3T HCU is a cardiopulmonary bypass temperature controller.

25.     The 3T HCU is used to provide temperature-controlled water to heat exchanger devices, including cardiopulmonary bypass heat exchangers, cardioplegia heat exchangers, and thermal regulating blankets, used to warm or cool a patient during cardiopulmonary bypass procedures lasting six (6) hours or less. The 3T HCU was never intended to come into contact with the patient.

26.     At all material times hereto, the Manufacturer Defendants were in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, advertising, delivering, and/or introducing their 3T HCU into the stream of interstate commerce, including Suffolk County within the Commonwealth of Massachusetts, either directly and/or indirectly through third parties, subsidiaries, and/or related entities.

27.     At all material times hereto, the 3T HCU was used during heart surgery at MGH and specifically during Plaintiff Robert Lux's mitral valve repair with annuloplasty ring surgery performed by Dr. Melnitchouk at MGH on January 25, 2017.

28.     On or about January 29, 2014, the Manufacturer Defendants received notice from a hospital in Switzerland that their 3T HCUs were contaminated with nontuberculous Mycobacterium *chimaera* ("*M. chimaera*" or "NTM"), and that the machines were causing patient infections by

6

airborne transmission (most likely aerosolization) into the operating theater.

29.     The Manufacturer Defendants were notified that six patients had been infected, two of whom had already died from the infections.

30.     On or about January 29, 2014, the Manufacturer Defendants were also notified that the cleaning protocols in place for the 3T HCUs were not effective at eliminating NTM contamination and that NTM was still present in the air around the machine after following the required cleaning protocols.

31.     The Manufacturer Defendants took no action to notify customers about the contaminated machines and in fact sought to prevent evidence linking the 3T HCU to patient infections from being disclosed publicly.

32.     In August 2014, the Manufacturer Defendants confirmed through internal investigation and testing that their 3T HCUs were contaminated with NTM and the source of the contamination was their manufacturing plant in Munich. This information did not become public until the FDA sent out a "Safety Communication" on June 1, 2016.

33.     Upon information and belief, the Manufacturer Defendants intentionally suppressed and withheld information from hospitals in the United States and the Food and Drug Administration indicating that: (1) the 3T HCU's were contaminated with NTM; (2) the cleaning instructions in the 3T HCU were found to be ineffective against NTM and; (3) the machine could cause patient infections by aerosolizing bacteria during surgery. This information was intentionally withheld until July of 2015.

34.     On or about July 14, 2014, at the direction of Swiss Medic (a public health agency in Switzerland) the Manufacturer Defendants sent out an "Important Information" letter to hospitals outside the United States that had purchased their 3T HCUs. That "Important Information" letter was specifically addressed to "Hygiene Specialists, Cardiac Surgery Operating Room Responsible [sic],

Risk/Safety Managers, Distributors, Clinicians, Perfusionists, and other users of these devices," alerting them of the risk of infection from nontuberculous Mycobacterium as a result of the use of their 3T HCU.

35.     The July 14, 2014 "Important Information" letter emphasized the following:

It is **important** to assure that your staff is aware of the Mycobacteria risk and to review your hygiene and surgical practices in the cardiac surgery theatre. This review should include your sampling and monitoring programs for your water sources, solution preparations, and systems that use water in the cardiac surgery theatre. Among these water systems, **heater cooler device(s) need strict adherence to the cleaning, disinfection, and maintenance according to the operation manual (for Sorin devices, see Attachment 2). Without vigilant performance of the disinfection per the Operating Instructions, these organisms can multiply in a heater cooler device and potentially form biofilm.** As you are aware, the water in the heater cooler devices is not intended to have direct contact with the patient. One of the highest risks of contamination for the patient is a direct contact transfer of water/solution droplets containing Mycobacteria into the surgical field. *Another risk that should be reviewed is the air distribution* within the cardiac surgery theatre, as this can be a transmission method for Mycobacteria. The air conditioning as well as ventilation units **including the heater cooler device fans** need to be considered in that analysis.

During the investigation work it has been **identified that some hospital heater cooler devices are contaminated. By way of caution as a safety measure, Sorin reminds its customers using heater cooler devices about the importance of adhering to the correct maintenance of the device at all times and in particular to assure that the cleanliness of the water in the device is maintained.** If the water is not properly disinfected and maintained, microbiological growth can occur within the device and over time biofilm may form. We enclose hereto **our latest version of the operating instructions** for the 3T Heater Cooler Devices **giving clear guidance on** how the cleanliness of the water in the device is to be maintained. **Please note that strict adherence to the instructions is mandatory for the safe use of the device.**

**You may continue to safely use the heater cooler devices in accordance with the Operator's Manual.**

36.     The Manufacturer Defendants knew, or should have known, based on their own information, investigation, and/or testing, and based on an outbreak of cases in Europe reported in the medical literature as early as 2011, of the association between NTM infections and the use of their 3T

HCU in heart surgery.

37.     The Manufacturer Defendants knew when they sent the July 2014 letter to customers outside the United States, that the cleaning protocol they had adopted was never validated against NTM and was not effective at eliminating NTM or biofilm from the 3T HCU.

38.     Despite knowledge of the design defect and contaminated water supply used during the manufacture of their 3T HCU, and despite knowledge of the catastrophic injuries, conditions, complications, infections, and/or deaths caused by the use of their 3T HCU during heart surgery in Europe since 2011 and elsewhere, the Manufacturer Defendants continued to manufacture, market, advertise, sell, and/or deliver their 3T HCU to hospitals throughout the USA, including the Massachusetts General Hospital in Boston, Massachusetts, while failing to adequately warn, label, instruct, and/or disseminate information with regard to the risk of their 3T HCU, both prior to and after the marketing and sale of the 3T HCU to MGH.

39.     In August of 2014, the Manufacturer Defendants sent a different version of the "Important Information" letter to hospitals in the United States, including MGH.

40.     The August 2014 letter sent to hospitals in the United States deleted all references to biofilm and also deleted the following sentence that was included in the July 2014 letter to non-U.S. customers: *"Another risk that should be reviewed is the air distribution within the cardiac surgery theatre, as this can be a transmission method for Mycobacteria."*

41.     In place of the sentence suggesting that the bacteria could be spread through the air, the Manufacturer Defendants used this sentence in the August 2014 letter that went to customers in the United States: *"Some users have observed clinical infections caused by Mycobacteria chimera in cardiac surgical patients. While this is a newly identifiable risk, we have found no causative link to*

*any particular cardiac surgery equipment, including the 3T."*

42.     This statement was false and was intended to assure hospitals in the United States that there was no risk of infection from the 3T HCU.

43.     The August 2014 letter also stated: "Please note that strict adherence to the Instructions in the Operator's Manual is mandatory for the safe use of the device."

44.     This statement was also false. The Manufacturer Defendants knew that their cleaning instructions had never been tested against *M. chimaera* and were advised in January 2014 that the cleaning instructions in the operator's manual could not eliminate NTM or biofilm from the machine.

45.     On or about April 30, 2015, the European Centre for Disease Prevention and Control ("ECDC") released a "Rapid Risk Assessment" which revealed that NTM infections following heart surgery that were potentially caused by the airborne transmission of NTM from contaminated 3T HCUs had been reported in Switzerland, Germany, and the Netherlands as early as 2011.

46.     On June 15, 2015, the Manufacturer Defendants issued a Field Safety Notice ("FSN") to hospitals including, upon information and belief, the Hospital Defendants, alerting them to the potential risks of patient infection posed by the 3T HCU.

47.     In addition to notifying hospitals that the 3T HCU could cause patient infection with *M. chimaera* via airborne transmission, the FSN also included: (1) updated cleaning and disinfection procedures; (2) recommendations and instructions for testing 3T HCUs for *M. chimaera*; and (3) recommendations to decommission and/or remove contaminated 3T HCUs from the operating room. Despite having learned that the 3T HCU could aerosolize bacteria in January 2014, the June 2015 FSN was the first time the Manufacturer Defendants notified hospitals in the United States about this risk.

48.     Despite learning in August 2014 that 3T HCUs had been contaminated during production

and shipped to hospitals already preloaded with *M. chimaera* biofilm, the June 2015 FSN did not disclose this information and in fact falsely suggested that hospitals were to blame for any contamination.

49.     The original process for cleaning and disinfecting the heater-cooler unit involved six (6) steps and the new process, posted in a video on the Sorin website, required fifty-six (56) steps.

50.     According to the June 15, 2015 FSN issued by Manufacturing Defendants, the cleaning and disinfecting process was "enhanced" by introducing the following modifications:

   a. The use of filtered tap water when using the device;

   b. Adherence to two different procedures (every 7 days and every 14 days) instead of three procedures (every five days, every two weeks and every three months) to make disinfection easier;

   c. The option to use peracetic acid instead of chloride solution;

   d. The use of H2O2 in low dose for preservation;

   e. The inclusion of all external tubing, bottles, and buckets in the disinfection process;

   f. The use of polyethylene tubing that meets national drinking water standards; and

   g. The requirement that unused heater-coolers be disinfected bi-weekly.

51.     On July 15, 2015, the United States Food and Drug Administration ("FDA") issued a Class 2 Recall of the 3T HCU because of "[p]otential colonization of organisms, including Mycobacteria, in Sorin Heater Cooler Devices, if proper disinfection and maintenance is not performed per instructions…."

52.     The recall directed customers to follow the new cleaning and disinfection procedures outlined in the FSN issued by the Manufacturer Defendants on June 15, 2015.

53.     The "enhanced" cleaning and disinfection protocol adopted by the Manufacturing Defendants was never validated to be effective against NTM and was in fact ineffective against NTM.

11

54.     Although the FSN contained warnings about the risk of infections caused by the 3T HCU, it did not disclose the original source of the *M. chimaera* contamination.

55.     The Manufacturer Defendants were aware that they had shipped machines contaminated with NTM biofilm to customers.  They were also aware that neither of the prescribed disinfectant chemicals (Clorox bleach and hydrogen peroxide) could effectively remove mycobacteria biofilm.

56.     Indeed, on July 7, 2014, Sorin employee Erwin Knott notified Sorin employee Thierry Dupoux (Vice President of Quality Assurance) that the prescribed amounts of Clorox would not be effective against NTM and if a higher concentration was used the machine would be destroyed "in a short time."

57.     Sorin also knew and had consulted with experts who had confirmed that hydrogen peroxide has no mycobactericidal efficacy. Despite knowing that neither Clorox nor hydrogen peroxide could remove NTM from the machines, the Manufacturing Defendants suggested to their customers and their own sales team that use of these chemicals would remove the bacteria from the 3T HCU and render the 3T HUC's water NTM free.

58.     The Manufacturer Defendants continued to falsely claim that their cleaning procedure could remove NTM until 2017, at which point they acknowledged that their cleaning procedures could not completely remove NTM. Instead of attempting to remove NTM from its machines, in 2017 Sorin modified its machines to include a vacuum cannister that captured NTM-contaminated aerosols before they could leave the machine.

59.     According to Thierry Dupoux, Sorin's Vice President of Quality Assurance, by preventing aerosols from escaping the 3T HCU the design change adding the vacuum cannister (implemented in 2017) has effectively prevented future infections with NTM.

60.     On or about September 18, 2015, the FDA received a MAUDE Adverse Event Report

Number MW5056456 regarding the 3T HCU from a "health care provider" who reported the following:

> Health system suspected/identified the following problems with product: due to an unusual
> cluster of non-tuberculous mycobacterium seen in patients post cardiothoracic surgery and
> recent reports from Europe indicating that aerosolization of this bacteria may be emitted from
> the Sorin heater cooler unit, our facility notified (b)(6) of our concern.  At the request of the
> state, (b)(6) sent a field team to our facility to conduct an investigation.  The results of the
> investigation are pending.  **There are concerns on the maintenance of this machine:
> manufacturer instructions are inconsistent between user manual, field safety notice, FAQ,
> "quick start" guide and instructional video.  The method of updating disinfection
> requirements has not been consistently distributed. The sales representative's verbal info is
> not always consistent with the written recommendations. The company's representative
> sent to place a new machine in production did not follow their established guidelines for
> disinfection.  There is concern if the multiple disinfection procedure changes will mitigate
> any potential biofilm growth.  Documentation or studies have not been provided. The steps
> for meeting the new recommended disinfection protocols are confusing and complex.
> Currently, there is not one document that had all of the recommendations; each of the
> documents listed in 2a of this section must be independently reviewed and considered.**

FDA Maude Adverse Event Report (September 18, 2015).

61.     On October 15, 2015, the FDA issued a Safety Communication which noted that

between January 2010 and August 2015, the agency received thirty-two (32) Medical Device Reports of

patient infections associated with heater-cooler device contamination: 8 in the U.S., and the remaining

24 predominantly from Western Europe.

62.     On October 21, 2015, the Untied States Centers for Disease Control and Prevention

("CDC") issued an Interim Practical Guidance Communication intended to raise awareness among

health departments, healthcare facilities and providers of the association between NTM infections and

the use of heater-cooler devices.

63.     On December 11, 2015, the Pennsylvania Department of Health ("PADOH") issued a

Health Advisory regarding heater-cooler systems and NTM infections, expressly acknowledging that

the 3T HCU has the potential for the colonization and aerosolization of bacteria.

64.     A joint investigation by the CDC and the PADOH into the deaths of patients who had undergone heart surgery at Wellspan York hospital in Pennsylvania concluded that NTM was "likely a contributing factor" of these deaths.

65.     The CDC has affirmatively linked the NTM infection risk to the 3T HCU used to regulate patient blood temperature during cardiovascular surgeries.

66.     The PADOH found that data "convincingly support[s] the conclusion that exposure to contaminated HCUs [heater-cooler units] is associated with NTM among patients undergoing open heart surgery on CPB [cardiopulmonary bypass]."

67.     The PADOH Advisory questioned inconsistencies in the evolution of disinfection instructions from several heater-cooler manufacturers, including the Manufacturing Defendants: "PADOH and PSA [Patient Safety Authority] observed significant differences in IFU ["Instructions for Use"] from one version to the next published by the same manufacturer and between manufacturers. IFU also varied depending on prior maintenance and disinfection history. In addition, language from the manufacturers was frequently ambiguous ("should" vs. "must") and some IFU were permissive of, but did not recommend, certain things (use of materials, chemical additives, procedures)."

68.     The Advisory also stated that the agencies "**observed engineering differences** that might predispose certain units to increased risk of biofilm and aerosolization of bacteria (e.g., **blind segments of internal tubing, overflow tubes with low flow**)".

69.     A public health investigation in Switzerland included microbiological examinations of environmental samples that identified NTM contamination in heater-cooler units, including water samples from the units. Air sampling cultures were positive for NTM when the units were running, but negative when they were turned off.

14

70.     On December 29, 2015, the FDA issued a Warning Letter addressed to the CEO of the

Manufacturing Defendants identifying the following "serious" violations of the Federal Food, Drug, and

Cosmetic Act ("Act"), 21 U.S.C. § 321(h), regarding the Manufacturer Defendants' 3T HCUs:

> a. The devices were **"adulterated"** within the meaning of section 501(h) of the Act in that "the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation are not in conformity with the current good manufacturing practice requirements of the Quality System regulation found at Title 21, Code of Federal Regulations (CFR), Part 280;" *Id.*

> b. Failure to establish and maintain procedures for the identification, documentation, validation, or, where appropriate, verification, review, and approval of design changes before their implementation, as required by 21 CFR 820.30(i);

> c. Failure to validate a process, with a high degree of assurance and approved according to established procedures, where results can be fully verified by subsequent inspection and test, as required by 21 CFA 820.75(a);

> d. Failure to adequately develop, implement, and maintain written Medical Device Reporting ("MDR") procedures as required by 21 CFR 803.17;

> e. Failure to submit to the FDA an approved application for premarket approval (PMA) pursuant to section 5159a) of the Act, 21 U.S.C. § 360e(a), or an approved application for an investigational device exemption under section 520(g) of the Act, 21 U.S.C. § 360j(g);

> f. Failure to notify the FDA of the intent to introduce the device into commercial distribution as required by section 510(k) of the Act, 21 U.S.C. § 360(k), resulting in **"misbranding"** of the 3T HCU as defined by section 520(o) of the Act, 21 U.S.C.§ 352(o);

> g. Failure to submit to the FDA a new 510(k) to assure that the appropriate testing and validation of the cleaning/disinfecting protocols had taken place following significant labeling changes that can affect the safety or effectiveness of the device, specifically the distribution of the Sorin HCU with modified Instructions for Use ("IFU") (Versions 013 and 014) with respect to the operating, maintaining, cleaning, and disinfecting of the device, including adding more instruction details, changes to the cleaning/disinfecting process (e.g. chemicals used and amounts used), and expansion of the process to include the entire circuit instead of only the tanks;

> h. Failure or refusal to furnish material information, with respect to the device in question, to the FDA as required by or under section 519 of the Act, 21 U.S.C. § 360i, and 21 CFR Part 806—Medical Devices; Reports of Corrections and Removals, resulting in **"misbranding"** of the 3T HCU as defined in section 502(t)(2) of the Act, 21 U.S.C. §

352(t)(2); and

i. Failure to submit to the FDA a written report, as required by 21 CFR 806.10, of any correction or rescission of advice initiated to remedy a violation of the Act caused by the device which may present a risk to health.

*See* FDA Warning letter (December 29, 2015) (emphasis added).

71.     A Class II recall of the 3T HCU was issued on March 17, 2016. The FDA's "determined cause" for the recall was "device design."

72.     On April 28, 2016, an article entitled, "Contamination During Production of Heater-Cooler Units by *Mycobacterium chimaera* Potential Cause for Invasive Cardiovascular Infections: Results of an Outbreak Investigation in Germany, April 2015 to February 2016" (hereinafter "Haller article") was published in the journal, Eurosurveillance.

73.     The Haller article presented the results of a surveillance of clinical cases and of contaminated heater-cooler units, as well as environmental investigations in Germany prior to February 2016.

74.     According to the Haller article, "[d]uring environmental investigations, *M. chimaera* was detected in samples from used HCUs [heater-cooler units] from three different countries and samples from new HCUs as well as in the environment at the manufacturing site of one manufacturer in Germany." The manufacturing facility identified was Manufacturer Defendants' facility in Munich, Germany.

75.     The Haller article concluded that, "at least some of the five German cases with *M. chimaera* infection may have occurred due to contamination of the HCUs by *M. chimaera* at the manufacturing site."

76.     Further, the Haller article noted, "[a]ccording to the information provided by the [Manufacturer Defendants], HCUs manufactured before mid-August 2014 may have had environmental

16

mycobacteria presence in the unit at the time of delivery."

77.     On or about June 1, 2016, the FDA issued a Safety Communication entitled, "Mycobacterium chimaera Infections Associated with Sorin Group Deutschland GmbH Stockert 3T Heater-Cooler System."

78.     The FDA's Safety Communication noted that, "[t]esting conducted by the [Manufacturer Defendants] in August 2014 found *M. chimaera* contamination on the production line and water supply at the 3T manufacturing facility."

79.     According to the FDA, the Haller article suggested "a direct link between the *M. chimaera* to which the European patients were exposed and became infected during open-chest cardiac surgery, and one specific heater-cooler model—the 3T."

80.     The FDA alerted health care facilities that if they purchased and used the Stockert 3T HCU prior to September 2014, they must "be aware the units may have been shipped from the factory contaminated with *M. chimaera.*"

81.     On October 13, 2016, the CDC distributed a Health Advisory, alerting health care providers that "[n]ew information indicates that [Stockert 3T] devices, manufactured by LivaNova PLC (formerly Sorin Group Deutschland GmbH), were likely contaminated with the rare bacteria *Mycobacterium chimaera* during manufacturing."

82.     The October 2016, CDC Health Advisory stated:

> CDC in collaboration with National Jewish Health completed a whole-genome sequencing analysis and results demonstrate that *M. chimaera* isolates from patients with heater-cooler associated infections and from the 3T heater-cooler devices from several U.S. hospitals (in Pennsylvania and Iowa) are all highly related to each other. This evidence for likely point-source contamination of the 3T heater-cooler devices is consistent with recent reports from Europe.

83.     The FDA also updated its June 2016 Safety Communication to include the results of the

CDC's testing, stating that, "[t]he results obtained strongly suggest that the tested 3T devices had a common source of *M. chimaera* contamination."

84. The design and/or manufacturing defects in the 3T HCU allowed bacteria, including NTM and, specifically, *M. chimaera*, to colonize and multiply within the water and component parts of the unit. Bacteria was then able to reach the patient and cause infection, as it did during Plaintiff Robert Lux's surgery, through aerosolization, fluid leakage, or other means.

85. Manufacturer Defendants knew or should have known of this risk before 2011, and clearly knew of this risk by 2014 when their own investigation revealed that 3T HCUs were (1) contaminated with mycobacteria at the manufacturing facility; and (2) releasing *M. chimaera* into the air when the 3T HCU was turned on and operating. Despite knowledge of the risk to patients, Manufacturer Defendants continued to manufacture, assemble, distribute, advertise and/or sell the 3T HCU to hospitals in the United States, including MGH.

86. Hospital Defendants knew or should have known prior to Plaintiff Robert Lux's January 25, 2017 surgery of the risk that 3T HCUs, including those owned and used by Hospital Defendants, posed to patients, including Plaintiff Robert Lux, but continued to use contaminated machines in cardiac surgery and permitted these machines to aerosolize bacteria into the operating room and infect Plaintiff Robert Lux.

87. The Hospital Defendants failed to respond to the risks identified in the FSN and the FDA and CDC publications and, upon information and belief continued to use the 3T HCUs and allow the units to directly vent aerosols into the operating room.

88. The Hospital Defendants failed to recognize and/or respond to numerous warnings in peer review literature published well before Plaintiff Robert Lux's surgery, cautioning that the 3T

HCUs: (1) were causing patient infections via airborne transmission; (2) could not be cleaned effectively even by following the manufacturers' cleaning instructions, which would not remove *M. chimaera* from the HCU water circuit; and (3) could disrupt laminar airflow and cause infections even when 3T HCUs were placed outside the sterile field.

89.     For instance, in July 2015, a peer reviewed paper entitled "Prolonged Outbreak of Mycobacterium Infection After Open-Heart Surgery" (hereinafter "Prolonged Outbreak Paper") was published in the journal Clinical Infectious Diseases and warned that 3T HCUs could aerosolize *M. chimaera* into the operating theater and were the most likely cause of an outbreak of infection in patients undergoing cardiac surgery.

90.     Upon information and belief, the Hospital Defendants took no mitigating action in response to the Prolonged Outbreak Paper.

91.     In June 2016, a peer reviewed paper entitled "Transmission of *Mycobacterium chimaera* From Heater-Cooler Units During Cardiac Surgery Despite Ultraclean Air Ventilation System" (hereinafter "Transmission of Mycobacterium Paper") was published in the journal Emerging Infectious Diseases and provided explicit warning that the ventilation fans of the 3T HCU were sufficiently powerful to overcome laminar airflow and contaminated the sterile field with airborne *M. chimaera* during surgery.

92.     Upon information and belief, the Hospital Defendants took no mitigating action in response to the Transmission of Mycobacterium Paper.

93.     In October 2016, a peer reviewed paper entitled "Reemergence of Mycobacterium Chimaera in Heater-Cooler Units Despite Intensified Cleaning and Disinfection Protocol" (hereinafter "Reemergence of Mycobacterium Paper") was published in the journal Emerging Infectious Diseases

and warned that the manufacturers' cleaning instructions for the 3T HCU could not eliminate *M. chimaera* from the 3T HCU water circuit.

94.     Upon information and belief, the Hospital Defendants took no mitigating action in response to the Reemergence of Mycobacterium Paper.

95.     On October 13, 2016, the FDA released an updated "Safety Communication" for medical facilities using the 3T HCU (hereinafter "Updated Safety Communication"). The purpose of the Updated Safety Communication was to provide "updated recommendations to help prevent the spread of infection related to the use of these devices."

96.     The FDA's Updated Safety Communication warned medical providers that the 3T HCUs had likely been contaminated during production and explicitly warned hospitals with 3T HCUs manufactured before September 2014 to "strongly consider transitioning away from these devices for open-chest cardiac surgery until the manufacturer has implemented strategies for these devices to mitigate the risk of patient infection."

97.     The Updated Safety Communication warned medical providers that "[u]se of [3T HCUs] should be limited to emergent and/or life-threatening situations if no other heater cooler devices are available."

98.     The Updated Safety Communication also warned medical providers that testing 3T HCUs for *M. chimaera* contamination was not recommended because of the high risk of a false negative result due to the slow growth of *M. chimaera* and the technical challenges associated with culturing this organism.

99.     Despite the explicit warnings and directions in the Updated Safety Communication, the Hospital Defendants continued to use 3T HCUs during non-emergent cardiac surgeries, including

Plaintiff Robert Lux's surgery, needlessly exposing him to an entirely avoidable and dangerous infection.

100.   On October 13, 2016, the CDC released Health Advisory ("Heath Advisory") warning hospitals and practitioners about potential infections caused by the 3T HCU.

101.   Included in the Health Advisory was a directive that it is "imperative that patients are informed about the risk of infection associated with use of the 3T device."

102.   The Health Advisory also recommended that practitioners obtain informed consent from patients before proceeding with surgery using a 3T HCU ( "Hospitals should consider using informed consent to educate patients of the potential NTM infection risk.").

103.   Dr. Lux was not informed about the unique infection risk posed by the 3T HCU prior to his surgery.

104.   Had Dr. Lux been informed prior to his elective surgery that 3T HCUs could cause incurable and highly lethal infections via airborne transmission, he would not have agreed to undergo surgery where a 3T HCU was in use and venting directly into the operating room.

105.   Other hospital systems offering the same cardio-thoracic surgery options as the Hospital Defendants had either stopped using 3T HCUs prior to 2017, or were preventing the units from exhausting directly into the operating room, thereby eliminating the risk of infection from contaminated devices.

106.   Upon information in belief, in 2014 Zurich University Hospital built a metal box over its 3T HCUs to prevent contaminated aerosols from escaping into the operating room.  This modification was described in the 2015 "Prolonged Outbreak" paper.

107.   Upon information and belief, Penn Presbyterian Medical Center in Philadelphia had

stopped using 3T HCUs due to the risk of infection by late 2015.

108.    Upon information and belief, Duke University Hospital stopped using 3T HCU's in June 2015 due to the risk of patient infections.

109.    Upon information and belief, Hershey Medical Center stopped using 3T HCU's in late 2015 due to risk of patient infections.

110.    Upon information and belief, by late 2015, University of Iowa Hospital had eliminated the risk of patient infections by contaminated 3T HCU's by moving the devices outside of the operating room.

111.    Upon information and belief, in 2016 Christiana Hospital in Delaware modified its 3T HCUs so that they would exhaust out of the operating room to prevent patient infections. This modification was accomplished by simply adding a cowling on the 3T HCU exhaust fans and directing the exhaust out of the operating room.

112.    Upon information and belief, the Hospital Defendants made no efforts to replace its 3T HCUs, or prevent contaminated aerosols from escaping into the operating room until late 2017.

### NTM Infection

113.    NTM bacteria, including *M. chimaera*, are slow-growing bacteria that are commonly found in nature, including soil and surface water.

114.    Although these bacteria are not typically harmful in immune-competent individuals, they can cause severe and often incurable infections in post-operative surgical patients and especially pose a risk for people with weakened immune systems or those who have had vascular grafts, prosthetic valves, or any other foreign device implanted into the body.

115.    Because the bacteria are slow growing, it can take up to six years before an infection

manifests and is correctly diagnosed.

116.    According to the CDC, "[d]ue to the potentially long delay between exposure to NTM and manifestation of clinical infection (up to several years), identifying infections related to the use of heater-cooler devices can be challenging."

117.    Symptoms of an NTM bacterial infection are nonspecific and may include: fever; pain, redness, heat or pus around a surgical incision; night sweats; joint pain; muscle pain; weight loss and fatigue.

118.    Use of contaminated 3T HCU's caused an unprecedent, global outbreak of *M. chimaera* infections. *See e.g.,* "Global outbreak of severe Mycobacterium *chimaera* disease after cardiac surgery: a molecular epidemiological study" (Lancet, 2017).

119.    Specifically, 3T HCU's were contaminated with a unique strain of Mycobacterium *chimaera* referred to as "sub lineage 1.1" *Id.*

120.    M. *chimaera* sub lineage 1.1 was traced back to the 3T HCU manufacturing plant in Munich, Germany. *Id.*

121.    The vast majority of cardiac surgery patient infections with *M. chimaera* (including Plaintiff Robert Lux's infection) were caused by sub lineage 1.1.

### Plaintiff Robert Lux, MD

122.    On January 25, 2017, Plaintiff Robert Lux underwent an elective, noninvasive mitral valve repair with annuloplasty ring surgery performed by Defendant Dr. Melnitchouk and assisted by Masaki Funamoto, MD, at MGH.

123.    Plaintiff Robert Lux's preoperative diagnosis was mitral valve prolapse.

23

124.    Unbeknownst to Plaintiff Robert Lux, a contaminated 3T HCU was used during his surgery and was allowed to exhaust directly into the operating room.

125.    Plaintiff Robert Lux initially appeared to do well following his January 25, 2017 surgery, however, in January 2019, Plaintiff Robert Lux began to have mid-to-low back pain and at least one episode of drenching night sweats.

126.    Plaintiff Robert Lux tried to control his symptoms with conservative treatment before undergoing an MRI in November 2019, which showed lesions in his vertebral bodies as well as epidural abscess.

127.    In early December 2019, Plaintiff Robert Lux presented to Concord Hospital for low back pain and was diagnosed with vertebral osteomyelitis and spinal abscesses. Plaintiff Robert Lux was initially treated with four weeks of vancomycin and ceftriaxone.

128.    After starting vancomycin, Plaintiff Robert Lux experienced worsening lower extremity weakness, new hematuria, shortness of breath, decreased appetite, urinary urgency, and abdominal bloating.

129.    Plaintiff Robert Lux was readmitted to Concord hospital and spine surgery was recommended.

130.    Plaintiff Robert Lux self-transferred to MGH for a second opinion and further management on December 12, 2019.

131.    On December 12, 2019, Plaintiff Robert Lux was admitted to MGH with a chief complaint of low back pain and unsteady gait.

132.   Plaintiff Robert Lux underwent MRIs performed at MGH, which showed evidence of multi-level vertebral osteomyelitis and spinal abscesses. Plaintiff Robert Lux was also experiencing neurologic symptoms and neurosurgery spine and infectious disease consults were ordered.

133.   On December 13, 2019, Plaintiff Robert Lux was seen for consultation by Gabriel Friedman, MD, of neurosurgery.

134.   Dr. Friedman noted "given patient's reassuring neurological exam, recommend admission to medicine with ID consultation for antibiotic treatment of epidural spinal abscess and osteomyelitis. If drainage or sampling is needed, recommend IR consultation."

135.   On December 13, 2019, Plaintiff Robert Lux was seen for an infectious disease consultation by Michael Aronoff, MD. Dr. Aronoff's assessment and plan were as follows:

A/P: 73 yo male MD with Hx prior mitral valve replacement and hypertension presented to Concor [sic] Hospital in November with MRI that revealed thoracolumbar & epidural Vanco/CTX ~ 12/14/19. Course c/b AKI ? 2/2Vanco toxicity in setting of hematuria. Despite Rx now with increased back pain and gait instability, imaging remains with changes as outlined above. Main concern is clinical deterioration in setting of seemingly 'appropriate' antibiotics. NS not inclined to operate

1. LFT

2. Resume Vanco dosed for current Creat Cl (with assistance pharmacy)

3. Resume CTX2g q24

4. Brucella ab

5. IGRA

6. Since NS not planning to go to OR - ask IR to Bx L1/2 andT3/4 for micro (gram stain/culture, fungal culture, AFB stain and mycobacterial culture) .. Also need to send samples to path

7. Weekly CBC, CMP, ES/CRP and Vanco levels

Suspect will need OPEN procedure.
Discussed with team

136.    An addendum by Dr. Aronoff provided in part "given extent of disease – would benefit from open procedure".

137.    On December 14, 2019 and December 15, 2019, Plaintiff Robert Lux was seen by Amir Moheb Mohareb, MD, as part of the infectious disease consult service and the decision was made to hold antibiotics for 1-2 days while waiting for a CT-guided aspiration.

138.    On December 15, 2019, Dr. Mohareb noted: "Ideally, would biopsy both involved bone and paraspinal collection with samples sent to both microbiology and pathology. Micro testing should include gram stain, culture, anaerobic culture, fungal wet prep/ culture, AFB stain and culture."

139.    Dr. Mohareb also noted "a tissue sample (bone)" should be sent "to microbiology with the instructions 'Save sample for 16S PCR testing.'"

140.    On December 16, 2019, Plaintiff Robert Lux underwent a CT-guided bone biopsy and epidural abscess aspiration. The cultures remained negative.

141.    On December 23, 2019, Plaintiff Robert Lux was discharged from MGH on Daptomycin and Ciprofloxacin.

142.    Plaintiff Robert Lux continued to treat with Dr. Aronoff and Dr. Shankar as an outpatient until February 14, 2020, when his symptoms progressed to the point that he could not walk and Dr. Aronoff recommended Plaintiff Robert Lux present to the MGH Emergency Department.

143.    On February 14, 2020, Plaintiff Robert Lux presented to the MGH Emergency Department with a chief complaint of pain and "inability to walk" and was admitted to neurosurgery.

144.    On February 15, 2020, a chest CT showed: "Subpleural ground glass opacity in the left upper lobe and RIGHT upper lobe concerning for septic emboli. Cardiomegaly with elongated right atrial appendage of uncertain 80. Echocardiography is recommended to rule out endocarditis."

145.    A February 14, 2020 CT of the abdomen showed psoas abscesses.

146.    A February 15, 2020 MRI of the lumbar spine showed:

1.  Motion degraded examination.
2.  Redemonstration of multilevel discitis-osteomyelitis at T3-T4, T6-T7, L1-L2, and L4-L5 with associated epidural and paraspinal phlegmon and abscesses, resulting in up to severe spinal canal and neural foraminal narrowing, as detailed above.
3.  Since 12/20/2019, increased ventral epidural abscesses at L4-L5 with moderate spinal canal stenosis and compression of bilateral descending L5 nerve roots.
4.  Minimally increased epidural abscess/phlegmon at T3-T4.
5.  No significant change in spinal cord signal abnormality at T3-T4 and T6-T7.6. Increased erosive endplate changes at L1-L2.

147.    On February 16, 2020, the chest CT and lumbar MRI were reviewed by Joseph B. El-Khoury, MD, of infectious diseases who agreed "with the plan for definitive open surgery for I&D and debulking of infected tissue as well as to obtain a microbiologic diagnosis."

148.    Dr. El-Khoury's plan also included sending the OR specimen for "bacterial, fungal and mycobacterial stains and cultures, modified AFB stains and would look for atypical organisms such as nocardia or actinomyces."

149.  Dr. El-Khoury also recommended that the OR specimen be sent for molecular testing (PCR/16S) and ordered a TTE looking for endocarditis in view of chest CT findings. Dr. El-Koury recommended a TEE in the event the TTE produced a negative result.

150.  On February 19, 2020, Plaintiff Robert Lux underwent a T2-T8 decompression and fusion and T12-L5 decompression and fusion for progressive destructive changes related to *M. Chimaera* at T3-T4, T6-T7, L1-L2, and L4-L5 performed by Ganesh M. Shankar, MD, at MGH.

151.  Plaintiff Robert Lux's preoperative and postoperative diagnoses were multifocal thoracolumbar discitis and osteomyelitis with thoracic myelopathy and lumbar radiculopathy.

152.  Mycobacteria cultures were taken from tissue in the L4-L5 disc space.

153.  On February 20, 2020, Plaintiff Robert Lux was seen by Edward T. Ryan, MD, of infectious diseases who noted that three separate OR samples were acid-fast bacilli (AFB) smear positive. Dr. Ryan also noted: "NTM also very possible. He was on bypass Jan 2017; I think that is after M chimaera recall issue but will check."

154.  The AFB-positive smears were from the samples taken from the T6-T7, T3-T4 and L4-5 disc spaces. The smears from the samples taken from L1-L2 were AFB negative.

155.  On February 21, 2020, Plaintiff Robert Lux began mycobacterial treatment with azithromycin, rifampin, ethambutol, and amikacin. The differential diagnosis at this time was tuberculosis, NTM including *M. avium complex* ("MAC") and *M. chimaera*.

156.  On February 27, 2020, Iminem and INH were added to Plaintiff Robert Lux's antibiotic regimen while awaiting further culture results.

157.   On March 3, 2020, the tissue cultures taken during the February 19, 2020 surgery started growing MAC and the Iminem, INH, and Pyroxine were removed from Plaintiff Robert Lux's antibiotic regimen. He continued on amikacin, azithromycin, ethambutol, and rifampin.

158.   On March 6, 2020, Plaintiff Robert Lux was discharged from MGH with instructions to continue on his antibiotic regimen of amikacin 1500mg IV 3x/week, azithromycin 500 mg PO daily, ethambutol 1600 mg PO daily, rifampin 600 mg PO daily to treat his *M. Chimaera* infection following discharge.

159.   The tissue culture collected from Plaintiff Robert Lux's L4/L5 disc material on February 19, 2020 was sent to National Jewish Health ("NJH").

160.   On April 17, 2020, NJH was able to isolate mycobacterium avium complex from the tissue culture and confirmed the infection was *M. Chimaera*.

161.   Subsequently, NJH performed whole genome sequencing on the isolates and confirmed the bacteria "is a member of the *M. chimaera* Heater-Cooler Unit (HCU) clone 1 implicated in the *M. chimaera* outbreak" proving Plaintiff Robert Lux's infection was caused by a 3T HCU that was contaminated with *M. chimaera* during the manufacturing process in Germany. At all times material hereto, the Manufacturer Defendants marketed their 3T HCUs to the medical community, hospitals, administrators, cardiac surgeons, perfusionists, and/or other consumers as safe, effective, reliable medical devices to be used during heart surgery, such as the one performed on Plaintiff Robert Lux on January 25, 2017.

162.   At all times material hereto, the Manufacturer Defendants marketed, promoted, sold, and distributed their 3T HCUs to the medical community, hospitals, administrators, cardiac surgeons,

perfusionists, and/or other consumers utilizing carefully planned multifaceted marketing campaigns and strategies, including, but not limited to, advertising, brochures, pamphlets, mailings, documents, websites, and aggressive marketing at medical conferences and hospitals, including the provision of valuable consideration and benefits to the health care providers and/or hospital administrators.

163.   At all times material hereto, the Manufacturer Defendants marketed and sold their 3T HCUs to the medical community, hospitals, administrators, cardiac surgeons, perfusionists, and/or other consumers when they knew, or should have known, of a serious design defect that caused patients in the heart surgery operating room to be exposed to the risk of, and did infect patients, such as Plaintiff Robert Lux, with a serious and life-threatening infection due to nontuberculous Mycobacterium.

164.   At all times material hereto, the Manufacturer Defendants failed to perform or rely on proper and adequate testing and research in order to determine and evaluate the risks and benefits of their 3T HCUs.

165.   At all times material hereto, feasible and suitable alternative designs and products as compared to the 3T HCU have existed.

166.   At all times material hereto, the 3T HCU was utilized during heart surgery procedures in a manner foreseeable by the Manufacturer Defendants.

167.   At all times material hereto, the Manufacturer Defendants provided incomplete, insufficient, inadequate, and misleading instructions and training to the consumers of their 3T HCU, as well as their own sales representatives and technicians who would interact with the consumers, which resulted in the dissemination of inadequate warnings and instructions and misleading information to

consumers, including hospitals, hospital administrators, perfusionists, and/or cardiac surgeons, and resulted in life-threatening infections with NTM among patients who underwent heart surgery.

168.   At all times material hereto, the 3T HCU used in the heart surgery of Plaintiff Robert Lux was in the same or substantially similar condition as when it left the possession of the Manufacturer Defendants and was in the condition directed by and expected by the Manufacturer Defendants.

169.   The Hospital Defendants undertook and/or assumed a duty to render reasonable, proper, adequate, and appropriate medical care to Plaintiff Robert Lux and to avoid harm to him, which duty was breached by the Hospital Defendants.

170.   Plaintiff Robert Lux relied on the knowledge, treatment, and skill of the Hospital Defendants.

171.   The conduct of all Defendants increased the risk of harm for, was a substantial factor in causing, and/or was the factual cause of, the injuries, and damages suffered by Plaintiff Robert Lux, as set forth herein.

172.   As a direct and proximate result of the wanton, reckless, tortious, and/or negligent conduct of all defendants, jointly and severally, Plaintiff Robert Lux was caused to sustain serious and permanent physical and emotional injuries, including but not limited to a disseminated nontuberculous Mycobacterium chimaera infection and the consequences thereof. By reason of said injuries, Plaintiff Robert Lux has been caused to suffer permanent loss of function and has been caused to incur reasonable and necessary expenses for medical treatment; his activities have been restricted, and his ability to lead a normal life has been adversely affected.

173.   Plaintiff Robert Lux claims all damages recoverable under the law.

<u>COUNT I</u>
<u>BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY</u>
<u>Robert Lux v. Livanova/Sorin/Manufacturer Defendants</u>

174.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

175.    At all times relevant hereto, the Manufacturer Defendants were engaged in the business of the design, development, testing, promotion, manufacture, assembly, and/or sale of the 3T HCU used in the open-heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017.

176.    At all relevant times, the Manufacturing Defendants intended their 3T HCU to be used during heart surgery and it was used for the heart surgery of Plaintiff Robert Lux.

177.    Plaintiff Robert Lux was a person whom Manufacturing Defendants could reasonably have expected to use, consume or be affected by the 3T HCU within the meaning of Massachusetts General Laws c. 106 § 2-318.

178.    At all relevant times, Manufacturing Defendants expressly and impliedly represented and warranted, by and through statements made in labels, publications, package inserts, instructions for use and other written materials intended for users and the general public, that 3T HCUs were safe, effective and proper for their ordinary and particular purpose for which they were manufactured, sold, supplied and distributed.

179.    These express and implied representations included incomplete warnings and instructions that purported, but failed, to include a complete description of risk associated with use of the 3T HCU, including incomplete information that the devices: (1) were designed in a way that dangerous bacterium, including *M. chimaera,* could be released from the units during use, could disrupt laminar airflow, could contaminate the surgical field and prosthetic devices and cause patient infections;

32

(2) may have been shipped by the Manufacturing Defendants preloaded with *M. chimaera*; and (3) could not be effectively cleaned or sterilized in order to remove dangerous bacteria, including *M. chimaera*. Nevertheless, Manufacturing Defendants expressly and impliedly represented that 3T HCUs were safe and effective for use in cardiac surgery.

180.    The representations about 3T HCUs, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express and implied warranty that the goods would conform to the representation.

181.    At all material times hereto, the Manufacturing Defendants breached implied warranties with respect to their 3T HCU, including implied warranties that their 3T HCU was of merchantable quality, that their 3T HCU had been adequately and appropriately tested, and that their 3T HCU was fit for its intended use during heart surgery. Specifically, Manufacturing Defendants breached the warranties in the following ways:

A.    **Defective Design**

182.    The 3T HCU was defective at the time it was designed, manufactured, assembled, and sold by the Manufacturer Defendants in that its defective design prevented it from being reliably and consistently cleaned, disinfected, and maintained based on the expected and reasonably foreseeable use of the 3T HCU with its accompanying instructions, thus rendering the 3T HCU unsafe for the use for which it was intended, namely the mitral valve repair of Plaintiff Robert Lux by the Hospital Defendants on January 25, 2017.

33

183.   The 3T HCU was also defectively designed in that it allowed water aerosols contaminated with infectious NTM bacteria to escape the machine during use, disrupt the laminar flow surrounding the sterile surgical field and infect patients during surgery.

184.   The 3T HCU used by the Hospital Defendants for the mitral valve repair surgery of Plaintiff Robert Lux on January 25, 2017, was expected to reach, and did reach, the intended consumer, Defendant Hospital MGH, without substantial relevant change in the condition in which it was sold by the Manufacturer Defendants.

185.   At the time the 3T HCU left the possession and control of the Manufacturer Defendants it was in a defective condition, unreasonably dangerous to Plaintiff Robert Lux and others, in that its design permitted bacteria to collect, grow, and/or flourish, and subsequently be aerosolized to contaminate the surrounding area in the operating room suite during open-heart surgery.

186.   At all material times hereto, the Manufacturer Defendants intended its 3T HCU to be used during heart surgery cases, and knew or should have known that it would have been used in patients like Plaintiff Robert Lux who underwent mitral valve repair heart surgery at MGH.

187.   At all material times hereto, the use of the 3T HCU during heart surgery cases, such as in patients like Plaintiff Robert Lux was reasonably foreseeable by the Manufacturer Defendants as their 3T HCU was used in the manner for which it was intended by the Hospital Defendants who purchased and used the 3T HCU during Plaintiff Robert Lux's surgery.

188.   At all material times hereto, Plaintiff Robert Lux could not have, by the exercise of reasonable care, discovered the design defects and risks as noted herein, nor could he have been

expected to perceive the danger, and thus the unreasonably dangerous and hazardous condition of the 3T HCU was unknowable to Plaintiff Robert Lux.

189.   At all material times hereto, the 3T HCU used during the heart surgery of Plaintiff Robert Lux at MGH on January 25, 2017, was defectively designed and/or manufactured, rendering it defective and unreasonably dangerous and hazardous when it left the possession of the Manufacturer Defendants.

190.   At all material times hereto, the 3T HCU that the Manufacturer Defendants designed, manufactured, marketed, sold, and/or placed in the interstate stream of commerce in the USA was inherently and unreasonably dangerous and defective, and was unfit and unsafe for its intended and/or reasonably foreseeable uses, and did not meet and/or perform to the expectations of consumers like Plaintiff Robert Lux and his health care providers, including the Hospital Defendants.

191.   At all material times hereto, Plaintiff Robert Lux had the reasonable expectation that the 3T HCU, a medical device used during his heart surgery at MGH on January 25, 2017, would not be unreasonably dangerous and defective, and would not place him at increased risk of a life-threatening NTM infection.

192.   At all material times hereto, the risk posed by this defective 3T HCU, namely the risk of developing a life-threatening infection with NTM, clearly outweighed its utility. The dangerous condition of this defective 3T HCU was unknown and unknowable to Plaintiff Robert Lux.

193.   At all material times alternative designs were available that would have reduced the risk of biofilm formation inside the 3T HCU and eliminated the risk of contaminated aerosols escaping the device and causing patient infections via airborne transmission.

35

194.   Alternative devices manufactured by, among others, Maquette and Cincinnati Sub-Zero contained fewer and less powerful ventilation fans than the 3T HCU that greatly reduced the risk of a contaminated aerosols escaping the device and reaching the surgical field. *See, e.g.,* Richard Kuehl, et al., <u>Different Types of Heater-Cooler Units and Their Risk of Transmission of *Mycobacterium chimaera* During Open-Heart Surgery: Clues From Device Design</u>, J. Infectious Control & Hosp. Epidemiology (2018).

195.   Alternative devices manufactured by, among others, Maquette and Cincinnati Sub-Zero, oriented ventilations fans so that they would not exhaust horizontally, thereby greatly reducing the risk of contaminated aerosols reaching the surgical field and infecting patients. *See* design graphic below, excerpted from, Richard Kuehl, et al., <u>Different Types of Heater-Cooler Units and Their Risk of Transmission of *Mycobacterium chimaera* During Open-Heart Surgery: Clues From Device Design</u>, J. Infectious Control & Hosp. Epidemiology (2018):



196.   Manufacturing Defendants' own "Competitive Product Testing" testing confirmed that alternative brand heater-cooler units, including the Cincinnati Sub-Zero did not emit aerosols capable of reaching the surgical field.

197. In 2017 and 2018, Manufacturing Defendants began selling alternatively designed 3T HCUs with a suction device and cannister which eliminated the possibility of contaminated aerosols escaping the device during use and causing infections.

198. At all material times hereto, the design defect of the 3T HCU that Manufacturer Defendants designed, manufactured, marketed, sold, and/or placed in the interstate stream of commerce in the USA created a potentially catastrophic and/or life-threatening risk to patients like Plaintiff Robert Lux that far outweighed its utility and far outweighed the costs of designing, manufacturing, and producing an alternate design that was not defective.

199. At all material times hereto, the Manufacturer Defendants designed, manufactured, marketed, sold, and and/or placed in the interstate stream of commerce the defective 3T HCU used during the open-heart surgery of Plaintiff Robert Lux at MGH on January 25, 2017. The use of this 3T HCU was a factual cause of the injuries of Plaintiff Robert Lux.

200. As a direct and proximate result of the use of the defective 3T HCU during the heart surgery of Plaintiff Robert Lux at MGH on January 25, 2017, Plaintiff Robert Lux was catastrophically injured and sustained severe pain and suffered permanent loss of function and has been caused to incur reasonable and necessary expenses for medical treatment; his activities have been restricted, and his ability to lead a normal life has been adversely affected.

201. By reason of its designing, manufacturing, assembling, and distributing the 3T HCU in a defective and unreasonably dangerous condition, the Manufacturer Defendants are strictly liable to Plaintiff Robert Lux for his injuries and losses.

202.    Plaintiff Robert Lux claims all damages recoverable under the law, including but not limited to compensatory damages.

**B.    Defective Manufacture**

203.    The 3T HCU was defective at the time it was manufactured, assembled, and sold by the Manufacturer Defendants in that it was contaminated with NTM while on the production line of the LivaNova Deutschland manufacturing facility, and its defective design prevented it from being reliably and consistently cleaned, disinfected, and maintained based on the expected and reasonably foreseeable use of the 3T HCU with its accompanying instructions, thus rendering the 3T HCU unsafe for the use for which it was intended, namely the heart surgery of Plaintiff Robert Lux by Hospital Defendants on January 25, 2017.

204.    The 3T HCU used by the Hospital Defendants for the heart surgery of Plaintiff Robert Lux on January 25, 2017, was expected to reach, and did reach, the intended consumer, Defendant Hospital MGH, without substantial relevant change in the condition in which it was sold by the Manufacturer Defendants.

205.    At the time the 3T HCU left the possession and control of the Manufacturer Defendants it was in a defective condition, unreasonably dangerous to Plaintiff Robert Lux and others, in that it was contaminated with NTM while on the production line at the Sorin Deutschland manufacturing facility and its defective design permitted bacteria to collect, grow, and/or flourish, and subsequently be aerosolized to contaminate the surrounding area in the operating room suite during open-heart surgery.

206.    At all material times hereto, the Manufacturer Defendants intended its 3T HCU to be used during heart surgery cases, and knew or should have known that it would have been used in

surgeries on patients like Plaintiff Robert Lux who underwent mitral valve repair with annuloplasty ring heart surgery at MGH.

207.    At all material times hereto, the use of the 3T HCU during heart surgery cases, such as the surgery performed on Plaintiff Robert Lux, was reasonably foreseeable by the Manufacturer Defendants as their 3T HCU was used in the manner for which it was intended by the MGH defendants who purchased and used the 3T/HCU during Plaintiff Robert Lux's surgery.

208.    At all material times hereto, Plaintiff Robert Lux could not have, by the exercise of reasonable care, discovered the manufacturing and design defects and risks as noted herein—nor could he have been expected to perceive the danger—and thus the unreasonably dangerous and hazardous condition of the 3T HCU was unknowable to Plaintiff Robert Lux.

209.    At all material times, the 3T HCU used during Plaintiff Robert Lux's cardiac surgery at MGH on January 25, 2017, was defectively manufactured, rendering it defective and unreasonably dangerous and hazardous when it left the possession of the Manufacturer Defendants.

210.    At all material times hereto, the 3T HCU that the Manufacturer Defendants designed, manufactured, marketed, sold, and/or placed in the interstate stream of commerce in the USA was inherently and unreasonably dangerous and defective, and was unfit and unsafe for its intended and/or reasonably foreseeable uses, and did not meet and/or perform to the expectations of consumers like Plaintiff Robert Lux and his health care providers, including the Hospital Defendants.

211.    At all material times hereto, Plaintiff Robert Lux had the reasonable expectation that the 3T HCU, a medical device used during his heart surgery at MGH on January 25, 2017, would not be

unreasonably dangerous and defective, and would not place him at increased risk of a life-threatening NTM infection.

212. At all material times hereto, the risk of this defective 3T HCU, namely the risk of developing a life-threatening infection with NTM, clearly outweighed its utility. The dangerous condition of this defective 3T HCU was unknown and unknowable to Plaintiff Robert Lux.

213. At all material times hereto, the design defect of the 3T HCU that the Manufacturer Defendants designed, manufactured, marketed, sold, and/or placed in the interstate stream of commerce in the USA created a potentially catastrophic and/or life-threatening risk to patients like Plaintiff Robert Lux that far outweighed its utility and far outweighed the costs of designing, manufacturing, and producing an alternate design that was not defective.

214. At all material times hereto, the Manufacturer Defendants designed, manufactured, marketed, sold, and and/or placed in the interstate stream of commerce the defective 3T HCU used during the heart surgery of Plaintiff Robert Lux at MGH on January 25, 2017. The use of this 3T HCU was a factual cause of the injuries to Plaintiff Robert Lux.

215. As a direct and proximate result of the use of the defective 3T HCU during the heart surgery of Plaintiff Robert Lux at MGH on January 25, 2017, Plaintiff Robert Lux was catastrophically injured and sustained severe pain, and suffered permanent loss of function and has been caused to incur reasonable and necessary expenses for medical treatment; his activities have been restricted, and his ability to lead a normal life has been adversely affected.

216.   By reason of their designing, manufacturing, assembling, and distributing the 3T HCU in a defective and unreasonably dangerous condition, the Manufacturer Defendants are strictly liable to Plaintiff Robert Lux for their injuries and losses.

217.   Plaintiff Robert Lux claims all damages recoverable under the law, including but not limited to compensatory damages.

**C.    Failure to Warn**

218.   At the time the 3T HCU left the possession and control of the Manufacturer Defendants, it was in a defective condition and unreasonably dangerous in that it contained inadequate warnings and/or instructions to alert consumers, including the Hospital Defendants, of the full risks and propensity to cause injury due to its defective design and manufacturing defects, subjecting Plaintiff Robert Lux, to risks that exceeded the benefits of the product and risks that exceeded the expectations of any consumer, including, but not limited to, the risks of life-threatening NTM infections.

219.   The Manufacturer Defendants failed to properly and adequately warn and instruct Plaintiff Robert Lux's health care providers, including the Hospital Defendants, as to the safest and most effective methods of maintaining and/or cleaning the defective 3T HCU.

220.   The Manufacturer Defendants failed to properly and adequately warn Plaintiff Robert Lux's health care providers, including the Hospital Defendants, that the defective design of its 3T HCU rendered it impossible for any cleaning protocol to achieve the efficacious cleaning and disinfection that would prevent life-threatening infections from NTM.

221.   The Manufacturer Defendants failed to properly and adequately warn and instruct consumers such as Plaintiff Robert Lux's health care providers, including the Hospital Defendants, as to

the risks of their 3T HCU. This included inadequate warnings that allowing 3T HCUs to ventilate directly into the operating room presented a substantial and unnecessary risk to patients acquiring an incurable and highly lethal infection.

222.   The Manufacturer Defendants failed to properly and adequately warn and instruct consumers such as Plaintiff Robert Lux's health care providers, including the Hospital Defendants, with regard to the inadequate research and testing of their 3T HCU, and the complete lack, due to its defective design, of a safe and effective method of reliably cleaning, disinfecting, and maintaining the 3T HCU.

223.   Had the Manufacturer Defendants provided adequate warning and/or instructions to Plaintiff Robert Lux's health care providers, including the Hospital Defendants, regarding the defective design of their 3T HCU and/or that it may have been shipped pre-loaded with *M. chimaera*, Plaintiff Robert Lux would not have undergone surgery with a 3T HCU and would not have been infected.

224.   The Manufacturer Defendants misrepresented the safety, risks, and benefits of their 3T HCU to Plaintiff Robert Lux's healthcare providers including the Hospital Defendants, while understating the risks and exaggerating the benefits to advance their own financial interests.

225.   The failure of the Manufacturer Defendants to sufficiently warn the Hospital Defendants was a factual cause of, and/or a substantial factor in causing the injuries to Plaintiff Robert Lux.

226.   As a direct and proximal result of the Manufacturer Defendants' improper and inadequate warnings and instructions regarding the risks of the defective design of their 3T HCU, Plaintiff Robert Lux was catastrophically injured and sustained severe pain, and suffered permanent loss

of function and has been caused to incur reasonable and necessary expenses for medical treatment; his activities have been restricted, and his ability to lead a normal life has been adversely affected.

227.    Plaintiff Robert Lux claims all damages recoverable under the law, including but not limited to compensatory damages.

**COUNT II**
**NEGLIGENCE**
**Robert Lux v. The Livanova/Sorin/Manufacturer Defendants**

228.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

229.    Manufacturer Defendants individually and by and through their actual, authorized, and/or apparent agents, servants, and/or employees, were negligent and reckless by reason of their designing, manufacturing, assembling, and distributing the 3T HCU used by the Hospital Defendants during the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017, in one or more of the following particular respects:

   a. Failure to manufacture and/or produce a 3T HCU that was not "adulterated" within the meaning of section 501(h) of the Act in that the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation were not in conformity with the current good manufacturing practice requirements of the Quality System regulation found at Title 21, Code of Federal Regulations (CFR), Part 280;

   b. Failure to establish and maintain procedures for the identification, documentation, validation, or, where appropriate, verification, review, and approval of design changes before their implementation, as required by 21 CFR 820.30(i);

   c. Failure to validate a process, with a high degree of assurance and approved according to established procedures, whose results can be fully verified by subsequent inspection and test, as required by 21 CFA 820.75(a);

   d. Failure to adequately develop, implement, and maintain written Medical Device Reporting ("MDR") procedures as required by 21 CFR 803.17;

   e. Failure to submit to the FDA an approved application for premarket approval (PMA) in effect

43

pursuant to section 515(a) of the Act, 21 U.S.C. § 360e(a), or an approved application for an investigational device exemption under section 520(g) of the Act, 21 U.S.C. § 360j(g);

f. Failure to notify the FDA of the intent to introduce the device into commercial distribution as required by section 510(k) of the Act, 21 U.S.C. § 360(k), resulting in misbranding of the 3T HCU as defined by section 520(o) of the Act, 21 U.S.C.§ 352(o);

g. Failure to submit to the FDA a new 510(k), to assure that the appropriate testing and validation of the cleaning/disinfecting protocols had taken place, following significant labeling changes that can affect the safety or effectiveness of the device, specifically, distributing the 3T HCU with modified Instructions for Use ("IFU") (Versions 013 and 014) with respect to the operating, maintaining, cleaning, and disinfecting of the device, including adding more instruction details, changes to the cleaning/disinfecting process (e.g. chemicals used and amounts used), and expansion of the process to include the entire circuit instead of only the tanks;

h. Failure or refusal to furnish material or information, with respect to the device in question, to the FDA as required by or under section 519 of the Act, 21 U.S.C. § 360i, and 21 CFR Part 806—Medical Devices; Reports of Corrections and Removals, resulting in "misbranding" of the 3T HCU device as defined in section 502(t)(2) of the Act, 21 U.S.C. § 352(t)(2);

i. Failure to submit to the FDA a written report, as required by 21 CFR 806.10, of any correction or removal of advice initiated to remedy a violation of the Act caused by the device which may present a risk to health;

j. Failure to adequately, appropriately, properly, reasonably, and timely address the problems with their 3T HCU after learning of an unusual cluster of nontuberculous Mycobacterium ("NTM") infections seen in patients post cardiac surgery;

k. Failure to adequately, appropriately, properly, reasonably, and timely address the design problems with their 3T HCU after learning of recent reports from Europe indicating that aerosolization of this NTM bacteria was being emitted from the 3T HCU;

l. Failure to adequately, appropriately, properly, reasonably, and timely address the design problems with their 3T HCU after learning of concerns about the maintenance of this machine;

m. Failure to adequately, appropriately, properly, reasonably, and timely address the design problems with their 3T HCU after learning of inconsistencies between the manufacturer instructions and the user manual, field safety notice, FAQ, "quick start" guide, and instructional video;

n. Failure to adequately, appropriately, properly, reasonably, timely, and consistently distribute the method of updating disinfection requirements for the 3T HCU;

o. Failure to adequately, appropriately, properly, reasonably, and timely train their employees and/or agents regarding the method of cleaning, maintaining, and/or disinfecting the 3T HCU such that their sales representative's verbal communications would be consistent with the written recommendations;

p. Failure to adequately, appropriately, properly, reasonably, and timely train their employees and/or agents regarding the method of cleaning, maintaining, and/or disinfecting the 3T HCU such that a company's representative sent to place a new machine in production would follow the manufacturer's established guidelines for disinfection;

q. Failure to adequately, appropriately, properly, reasonably, and timely develop and provide to users of the 3T HCU changes in the disinfection procedure that would actually mitigate any potential biofilm growth;

r. Failure to adequately, appropriately, properly, reasonably, and timely develop and provide to users of the 3T HCU documentation or studies that disinfection procedure changes actually mitigated any potential biofilm growth;

s. Failure to adequately, appropriately, properly, reasonably, and timely develop and provide to users of the 3T HCU steps for meeting the new recommended disinfection protocols that were not confusing and complex;

t. Failure to adequately, appropriately, properly, reasonably, and timely design their 3T HCU so as to make it less susceptible to cause life-threatening infections with NTM;

u. Failure to adequately, appropriately, properly, reasonably, and timely design their 3T HCU so as to prevent life-threatening infections with NTM;

v. Failure to adequately, appropriately, properly, reasonably, and timely test the 3T HCU to determine if the distributed instructions for cleaning and disinfecting actually prevented life-threatening infections with NTM;

w. Failure to adequately, appropriately, properly, reasonably, and timely test the 3T HCU to determine if the design, compared to alternate designs, increased the risk of life-threatening infections with NTM;

x. Failure to adequately, appropriately, properly, reasonably, and timely eliminate, rectify, and/or warn of known risks and dangers of life-threatening infections with NTM associated with their 3T HCU;

y. Failure to adequately, appropriately, properly, reasonably, and timely recall, modify, retrofit, and/or re-design their defective 3T HCU;

z. Failure to adequately, appropriately, properly, reasonably, and timely remove their defectively

designed 3T HCU from the stream of commerce;

aa. Failure to adequately, appropriately, properly, reasonably, and timely recommend that users of their defective 3T HCU stop using their defective 3T HCU product;

bb. Failure to adequately, appropriately, properly, reasonably, and timely design a HCU that did not create a no-flow and/or low-flow area or areas, and/or blind spots, that made the 3T HCU more difficult and/or impossible to adequately clean, disinfect, and/or maintain, thus increasing the risk of contamination with NTM and increasing the risk of infecting a patient with NTM while undergoing heart surgery in the operating room;

cc. Failure to adequately, appropriately, properly, reasonably, and timely design a HCU that was easier to maintain, clean, and/or disinfect;

dd. Failure to adequately, appropriately, properly, reasonably, and timely monitor and test the production lines in the plants that manufacture the 3T HCU to ensure that they were not contaminated with NTM;

ee. Failure to adequately, appropriately, properly, reasonably, and timely monitor and test the water supply used in the plants that manufacture the 3T HCU to ensure that it was not contaminated with NTM;

ff. Failure to formulate, adopt, and/or enforce the appropriate rules, policies, guidelines, policies, and/or protocols, and to properly oversee and supervise all persons in their corporation who are responsible for ensuring that these protocols are followed, to prevent the failure to adequately, appropriately, properly, reasonably, and timely monitor and test the production line in the plants that manufacture the 3T HCU to ensure that it was not contaminated with NTM;

gg. Failure to formulate, adopt, and/or enforce the appropriate rules, policies, guidelines, policies, and/or protocols, and to properly oversee and supervise all persons in their corporation who are responsible for ensuring that these protocols are followed, to prevent the failure to adequately, appropriately, properly, reasonably, and timely monitor and test the water supply used in the plants that manufacture the 3T HCU to ensure that it was not contaminated with NTM;

hh. Failure to develop and effectuate an effective risk management program which entails proper policies and procedures designed to identify the risk; proper education and training programs to educate and train employees, staff, and/or agents on the importance of the policies and procedures and the adherence to those policies and procedures to prevent the risk of causing injuries; programs to monitor the agents, staff, and/or employees to ensure that the policies and procedures are being followed and enforced; and proper investigation protocols for sentinel incidents that identify root causes, track trends, and enable corporations to develop new policies, procedures, and proper programs to modify behaviors to more effectively reduce or eliminate the identified risk; and

ii. Failure to timely inform Plaintiff Robert Lux, prior to February 21, 2020, that he had potentially been exposed to NTM during his heart surgery.

230.   The Manufacturer Defendants undertook and/or assumed a duty of care to Plaintiff Robert Lux, and to avoid harm to him, which duty was breached by defendants.

231.   Plaintiff Robert Lux relied on the duty of care owed by the Manufacturer Defendants.

232.   The Manufacturer Defendants breached their duty of care to Plaintiff Robert Lux and his healthcare providers, including the Hospital Defendants, through its wanton, reckless, and negligent designing, manufacturing, labeling, warnings, instructions, sale, and/or distribution of their 3T HCU that was used in the heart surgery of Plaintiff Robert Lux at MGH on January 25, 2017.

233.   For over one year following the heart surgery of Plaintiff Robert Lux at MGH on January 25, 2017, the Manufacturer Defendants received and retained information that their 3T HCU had a significant risk of causing life-threatening infections with NTM.

234.   The Manufacturer Defendants, while actually and subjectively aware of the significant increased risk involved, nevertheless proceeded with conscious indifference to the rights, safety, and welfare of others, and/or provided material representations that were false and known to be false and/or made as positive assertions of safety, all with reckless disregard to the truth, with the intent that these false representations would result in consumers, like the Hospital Defendants, continuing to purchase and/or use their defective 3T HCU.

235.   Despite the possession of the knowledge and information described herein, the Manufacturer Defendants failed to modify, amend, and/or alter their advertising, promotional literature, labeling, warning, and/or instructions to adequately disclose the defective design of their 3T HCU that significantly increased the risk of a life-threatening infection with NTM.

236.   The failure of the Manufacturer Defendants to re-design and/or re-label and/or amend its advertising, promotional literature, instructions, and/or warnings, was wanton and willful conduct made in reckless disregard for the health and well-being of consumers such as the Hospital Defendants and patients such as Plaintiff Robert Lux as this conduct was intended to conceal the adverse information known by the Manufacturer Defendants.

237.   The careless, wanton, willful, and reckless negligence of the Manufacturer Defendants increased the risk of harm of, was a substantial factor in causing, and/or was a factual cause of the injuries and damages suffered by Plaintiff Robert Lux, as set forth more fully above.

238.   As a direct and proximate result of the wanton, reckless, tortious, willful, and negligent conduct of the Manufacturer Defendants, as set forth herein, Plaintiff Robert Lux was catastrophically injured and suffered severe pain and permanent loss of function and has been caused to incur reasonable and necessary expenses for medical treatment; his activities have been restricted, and his ability to lead a normal life has been adversely affected.

239.   Plaintiff Robert Lux claims all damages recoverable under the law, including but not limited to compensatory damages.

**COUNT III**
**NEGLIGENCE**
**Robert Lux v. The Hospital Defendants**

240.   The preceding paragraphs are incorporated by reference as though fully set forth herein.

241.   The Hospital Defendants, individually and by and through their agents, servants, employees, and ostensible agents, were negligent and reckless in the medical care of Plaintiff Robert Lux on January 25, 2017, in one or more of the following particular respects:

a. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and

proper care in the cleaning of the subject 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

b. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care in the maintenance of the subject 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

c. Failure to adequately, appropriately, properly, reasonably, and timely follow the cleaning, disinfection, and/or maintenance instructions of the subject 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

d. Failure to adequately, appropriately, properly, reasonably, and timely perform the cleaning, disinfection, and/or maintenance procedures for the subject 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017, at the appropriate intervals;

e. Failure to adequately, appropriately, properly, reasonably, and timely understand, disseminate, and apply information that they knew, or should have known, suggested that the subject 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017, was unsafe;

f. Failure to recognize and ameliorate the risks of infection with NTM due to the contaminated 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

g. Failure to inform Plaintiff Robert Lux earlier than February 21, 2020, that his infection with NTM was due to the contaminated 3T HCU used in his heart surgery at MGH on January 25, 2017;

h. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care in the performance of adequate culturing of the subject 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

i. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care in the performance of adequate monitoring of the subject 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

j. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care in the performance of adequate inspection of the subject 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

k. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care in the replacement of the subject 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

l. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care in alerting the public, including Plaintiff Robert Lux of the life-threatening risk of the subject 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

m. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care by referring Plaintiff Robert Lux to an institution where he could undergo heart surgery and not be exposed to the risk of a life-threatening NTM infection as he was with the subject 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

n. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care in transferring Plaintiff Robert Lux to another institution where he would not be exposed to the risk of a life-threatening NTM infection as he was with the subject 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

o. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care by consulting experts in the field regarding the maintenance, cleaning, and disinfection of the 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

p. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care by consulting with the manufacturer regarding the design, maintenance, cleaning, and/or disinfection of the 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

q. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care by consulting with the manufacturer testing experts regarding the design, maintenance, cleaning, and/or disinfection of the 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

r. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care by consulting with the manufacturer design experts regarding the design, maintenance, cleaning, and/or disinfection of the 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

s. Failure to adequately, appropriately, properly, reasonably, and timely respond to adverse events associated with the 3T HCU similar to the one used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

t. Failure to adequately, appropriately, properly, reasonably, and timely respond to deaths associated with the 3T HCU similar to the one used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

u. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care regarding the maintenance, cleaning, and disinfection of the 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

v. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care by properly training employees regarding the maintenance, cleaning, and disinfection of the 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

w. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care by properly monitoring employees who were responsible for the maintenance, cleaning, and disinfection of the 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

x. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care by properly supervising employees responsible for the maintenance, cleaning, and disinfection of the 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

y. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care by exhibiting the proper oversight over employees responsible for the maintenance, cleaning, and disinfection of the 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

z. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care by establishing the proper policies, procedures, guidelines, and/or protocols regarding the maintenance, cleaning, and disinfection of the 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

aa. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care by ensuring that the proper policies, procedures, guidelines, and/or protocols regarding the maintenance, cleaning, and disinfection were followed for the 3T HCU used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017 were being followed;

bb. Failure to adequately, appropriately, properly, reasonably, and timely use reasonable and proper care by selecting a heater cooler system for use in open-heart surgeries performed at MGH that was not defective;

cc. Ignoring the August 2014 letter sent by the Manufacturer Defendants to all hospitals who had purchased the 3T HCU that warned of the potential for life-threatening infections with NTM;

dd. Ignoring reports in the European literature of deaths attributed to life-threatening infections with NTM associated with the use of the 3T HCU similar to the one used in the heart surgery performed on Plaintiff Robert Lux at MGH on January 25, 2017;

ee. Failure to develop and effectuate an effective risk management program which entails proper policies and procedures designed to identify the risk; proper education and training programs to educate and train employees, staff, and/or agents on the importance of the policies and procedures and the adherence to those policies and procedures to prevent the risk of causing injuries; programs to monitor the agents, staff, and/or employees to ensure that the policies and procedures are being followed and enforced; and proper investigation protocols for sentinel incidents that identify root causes, track trends, and enable corporations to develop new policies, procedures, and proper programs to modify behaviors to more effectively reduce or eliminate the identified risk;

ff. Failure to timely inform Plaintiff Robert Lux, prior to February 21, 2020, that he had potentially been exposed to NTM during his heart surgery; and

gg. Failing to adequately, appropriately, properly, reasonably, and timely follow the recommendations and warnings of the CDC and FDA with respect to use and maintenance of 3T HCU devices.

242.    The Hospital Defendants undertook and/or assumed a duty to render reasonable, proper, adequate, and appropriate medical care to Plaintiff Robert Lux, and to avoid harm to him, which duty was breached by the Hospital Defendants.

243.    Plaintiff Robert Lux, relied on the knowledge, treatment, and skill of the Hospital Defendants.

244.    The carelessness and negligence of the Hospital Defendants increased the risk of harm to, and was a substantial factor in causing, and/or a factual cause of, the injuries and damages suffered by Plaintiff Robert Lux, as set forth more fully herein.

245.    As a direct and proximate result of the wanton, reckless, tortious, and negligent conduct of the Hospital Defendants, as set forth herein, Plaintiff Robert Lux was catastrophically injured and suffered severe pain and permanent loss of function and has been caused to incur reasonable and necessary expenses for medical treatment; his activities have been restricted, and his ability to lead a

normal life has been adversely affected.

246.   Plaintiffs claim all damages recoverable under the law, including but not limited to compensatory damages.

**COUNT IV**
**LACK OF INFORMED CONSENT**
**Robert Lux v. Serguei Melnitchouk, MD, MPH**

247.   The preceding paragraphs are incorporated by reference as though fully set forth herein.

248.   Infections caused by contaminated 3T HCU were not a known and accepted risk of cardiac surgery in 2017.

249.   Infections caused by contaminated 3T HCUs could have been avoided by: (1) replacing contaminated 3T HCU's with alternative heater-cooler devices; (2) postponing elective surgeries until an alternative, safer device could be used; (3) ensuring that contaminated aerosols from 3T HCU's would not be directly vented into the operating room; and (4) informing patients like Plaintiff Robert Lux that they could delay their surgery until a suitably safe heater-cooler was available or go to a different medical facility in order to have surgery with a safe heater-cooler unit.

250.   Dr. Melnitchouk's failure to obtain informed consent consisted of, but is not limited to:

   a.   Failure to inform Plaintiff Robert Lux of the material risk that the 3T HCU used by Hospital Defendants during open-heart surgeries may have been contaminated with *M. chimaera*;

   b.   Failure to inform Plaintiff Robert Lux of the material risk that the 3T HCU used by Hospital Defendants during open-heart surgeries may have been contaminated with *M. chimaera* and that *M. chimaera* biofilm, that is difficult or impossible to remove, could form within the device;

   c.   Failure to inform Plaintiff Robert Lux of the material risk that using a contaminated 3T HCU during open-heart surgery could cause bacteria to aerosolize into the operating room and infect surgical patients with *M. chimaera*;

d. Failure to inform Plaintiff Robert Lux of the material risk that a *M. chimaera* infection sustained during open-heart surgery could cause any of the following: fever; pain, redness, heat or pus around a surgical incision; night sweats; joint pain; muscle pain; weight loss and fatigue; permanent disability; and death;

e. Failure to inform Plaintiff Robert Lux that infections caused by disseminated *M. chimaera* are usually incurable and carry a mortality rate in excess of 50%.

f. Failing to inform Plaintiff Robert Lux that the risk of infection could be eliminated entirely by postponing surgery or undergoing surgery where exhaust from a 3T HCU was not aerosolized directly into the operating room.

g. Failing to inform Plaintiff Robert Lux that by 2017 many (if not most) hospitals across the country and around the world offering with cardiac surgery had stopped using Sorin 3T HCUs or had taken steps to prevent the devices from aerosolization directly into the operating room and that Dr. Lux could have entirely avoid the risk of a *M. chimaera* infection by undergoing elective surgery at these alternative facilities.

251.   Dr. Melnitchouk knew or should have known the information regarding the material risks of *M. chimaera* infection during open-heart surgeries performed with 3T HCUs, as Hospital Defendants had a duty to adequately, appropriately, properly, reasonably and timely disseminate to hospital employees information about the risk of contaminated 3T HCUs that had already been published in the medical literature.

252.   Disclosure of the risk that the 3T HCU used by Hospital Defendants may be contaminated with a lethal bacterium that could cause an NTM infection in surgical patients resulting in permanent disability or death would have been a substantial factor in Plaintiff Robert Lux's decision to undergo an open-heart surgery performed by Dr. Melnitchouk at a hospital with a potentially contaminated 3T HCU on January 25, 2017.

253.   Plaintiffs claim all damages recoverable under the law, including but not limited to compensatory damages.

## COUNT V
## LOSS OF CONSORTIUM

**Mary Elizabeth Lux v. Defendants**

254.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

255.    As a direct and proximate result of the Defendants' conduct, which caused the injuries and losses to Plaintiff Robert Lux as set forth herein, Plaintiff Mary Elizabeth Lux has been, and will continue to be in the future, deprived of the services, society, and conjugal fellowship of her husband.

256.    Plaintiffs claim all damages recoverable under the law, including but not limited to compensatory damages.

### JURY CLAIM

The Plaintiffs hereby demand a trial by jury of all appropriate issues and matters.

Respectfully submitted,
The Plaintiffs,
By their attorneys,

Dated: 11/2/2021

Michael C. Shepard
B.B.O. No. 567842
Erika A. O'Donnell
B.B.O. No. 661534
Michael J. McCann
B.B.O No. 690542
Shepard Law, P.C.
160 Federal Street
Boston, MA  02110
(617) 451-9191

And

**COHEN, PLACITELLA, & ROTH, P.C.**
James P. Goslee, Esquire
Elizabeth M. Amesbury, Esquire
Two Commerce Square
2001 Market Street, Ste. 2900

55

Philadelphia, PA 19103
215-567-3500 (Telephone)
215-567-6013 (Fax)
jgoslee@cprlaw.com
eamesbury@cprlaw.com